## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTIMARK CORPORATION, a Pennsylvania Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| HIGHLAND COMMERCIAL ROOFING, LLC, an Arizona Limited Liability Company, and ERIK ROBERT ELLE, an adult individual, | ) ) ) ) ) | |
| Defendants. | | |

## **VERIFIED COMPLAINT**

Plaintiff CentiMark Corporation ("CentiMark"), by and through its undersigned counsel, Buchanan Ingersoll & Rooney PC, files this Verified Complaint against its former employee, Erik Robert Elle ("Elle"), and Highland Commercial Roofing, LLC ("Highland").

## **PARTIES**

1.　　CentiMark is a Pennsylvania corporation with its principal place of business located at 12 Grandview Circle, Canonsburg, Pennsylvania 15317.

2.　　Elle is an adult individual who is believed to reside at 333 West Highland Drive, Gilbert, Arizona 85233.

3.　　Highland is an Arizona limited liability company with its principal place of business at 638 North 5th Avenue, Phoenix, Arizona 85003. The two members of Highland, Patrick Cunningham and Brett Maurer, are both citizens of California.

## JURISDICTION

4.      This Court has jurisdiction over this civil action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and is between citizens of different states.

5.      This Court has personal jurisdiction over Elle because his employment agreement with CentiMark expressly provides that Elle irrevocably submits to the personal jurisdiction of the United States District Court for the Western District of Pennsylvania for any action or proceeding arising out of or related to his employment agreement. *See* Employment Agreement ("Agreement"), a copy of which is attached hereto as Exhibit A, at ¶ 7.06(b).

6.      Additionally, this Court has personal jurisdiction over Elle because he has the required minimum contacts with this forum to establish personal jurisdiction. Elle was employed by CentiMark, which is headquartered just outside of Pittsburgh, received compensation from CentiMark's office in Pittsburgh, and has corresponded regularly with the Pittsburgh office.

7.      This Court has personal jurisdiction over Highland because it has the required minimum contacts with this forum to establish personal jurisdiction. Highland was expressly notified by Centimark that its hiring of Elle constituted a violation of Elle's employment agreement, and has intentionally caused harm to CentiMark in this judicial district as a result of its employment of Elle and its receipt of CentiMark's trade secrets.

8.      Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391(2), as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Further, Elle and CentiMark have agreed that this judicial District has exclusive jurisdiction and venue over claims arising out of or relating to Elle's employment agreement. *See* Agreement, ¶ 7.06(c) (Ex. A)("venue of all such causes of

action <u>shall</u> be exclusively vested in the United States District Court for the Western District of Pennsylvania…").

## CENTIMARK'S BUSINESS

9.      Founded in 1968 in Pittsburgh, CentiMark has grown to become one of the largest commercial and industrial roofing contractors in the United States.

10.     CentiMark markets, sells, installs and services roofs and roofing systems throughout North America primarily to commercial and industrial customers.  CentiMark operates out of approximately 50 offices.

11.     The roofing industry is a highly competitive marketplace with many companies vying for the same large–scale industrial and commercial roofing projects.  Because of the size and importance of many of these projects, price and quality alone — while important factors — are not the only variables that factor into contractor selection.

12.     Like its competitors, CentiMark coordinates its sales efforts through a dedicated sales force where individual salespeople are assigned to specific territories or specific national accounts.

13.     CentiMark's salespeople develop sales in a variety of ways, but most importantly, through relationship building with local and national customers of CentiMark that reside in their territories.  These relationships, built over time, can often become the most important factor in roofing contractor selection, as customers come to rely upon the salesperson as their point of contact and the "face" of the company.

14.     CentiMark's salespeople inspect roofs, occasionally coordinate service calls for repairs, provide quotes and estimates for roofing or repair jobs and assist in the management of

roofing projects when they are underway. In general, CentiMark relies upon its salespeople to serve as the company's liaison with its customers for nearly all of the customers' roofing needs.

15.    CentiMark therefore places a great deal of trust in its salespeople by entrusting them with a vital company asset — namely, the relationship between the company and its customers.

16.    CentiMark also entrusts its salespeople with the company's confidential and proprietary business information regarding its customers and potential customers, including pricing, products, services, customer complaints, profit margins, sales, sales volumes, material costs, key contacts with customers, unique vendor and supplier relationships, unique customer needs, and warranty information.

17.    CentiMark expends a great deal of money through the salaries, commissions and draws of its salespeople to build strong customer relationships between CentiMark and its customers. CentiMark further supports its salespeople and their efforts to build strong customer relationships on behalf of the company by providing an inside telemarketing force; a dedicated service department that provides effective service, responsive operations staff, high quality roofing products and roofing systems that are consistently improved and updated; administrative support; a dedicated technical/estimation support staff to assist in preparing proposals; customer directories and/or reimbursement of expenses incurred in creating a customer database; computer hardware, software, and support services for use in preparing proposals and maintaining customer relationships; reimbursement of business related expenses; a monthly car allowance; and the strength and recognition of the CentiMark name.

## CENTIMARK'S EMPLOYMENT OF ELLE

18.    CentiMark hired Elle to start as an Associate Project Manager on August 14, 2006. When CentiMark hired him, Elle had no prior experience in the roofing industry.

19.     Elle's employment with CentiMark was contingent upon Elle signing a written employment agreement.

20.     When he started, Elle received an annual salary of $55,000 per year plus a performance–based commission. He also received significant benefits in the form of pension and incentive benefit plans, health care plans, and a company car.

21.     CentiMark required Elle to sign a written employment agreement because his position would expose him to the confidential and proprietary business information of the company, and would give him access to the company's customers.

## A.     The Terms of Agreement Were Clearly Highlighted

22.     In order to ensure that Elle fully understood the obligations that he would be undertaking if he were to accept the position as Associate Project Manager, CentiMark provided him with a two–page "IMPORTANT NOTICE" at the time it provided him with a copy of the Agreement to consider.

23.     The IMPORTANT NOTICE provided:

> AS A CURRENT EMPLOYEE BEING CONSIDERED FOR
> PROMOTION OR AS A POTENTIAL NEW EMPLOYEE
> BEING CONSIDERED FOR EMPLOYMENT, CENTIMARK
> HAS PRESENTED YOU WITH THE ATTACHED
> EMPLOYMENT AGREEMENT. THIS AGREEMENT
> CONTAINS SPECIFIC PROVISIONS WHICH YOU, AS A
> CANDIDATE FOR SUCH PROMOTION, SHOULD
> THOROUGHLY REVIEW WITH YOUR ATTORNEY,
> ACCOUNTANT OR OTHER ADVISOR OF YOUR CHOICE,
> PRIOR TO SIGNING. SINCE THIS AGREEMENT IS A
> BINDING LEGAL CONTRACT, IT IS STRONGLY
> RECOMMENDED THAT YOU REVIEW ITS CONTENTS
> WITH YOUR ATTORNEY. YOUR FULL UNDERSTANDING
> AND VOLUNTARY ACCEPTANCE OF THE TERMS OF THE
> AGREEMENT ARE VERY IMPORTANT.

*See* IMPORTANT NOTICE, a copy of which is attached hereto as Exhibit B.

24.     The IMPORTANT NOTICE informed Elle in highlighted format of some of the important provisions that would be included in the Agreement, including: the post employment restrictions on competition, his requirement to notify CentiMark of his future employer, CentiMark's right to obtain injunctive relief to enforce the agreement, that Pennsylvania law would govern any dispute about the agreement, and that any legal actions brought to enforce the agreement would be in courts in Pittsburgh, Pennsylvania. *See* IMPORTANT NOTICE, ¶¶ 1-5.

**B.      Elle Signs the IMPORTANT NOTICE and the Agreement**

25.     Elle initialed the IMPORTANT NOTICE in five places and then signed the document directly below a paragraph that stated: "I HAVE NOT BEEN THREATENED OR COERCED IN ANY WAY AND AGREE THAT I HAVE BEEN ADVISED TO SEEK LEGAL COUNSEL." *See* IMPORTANT NOTICE.

26.     Elle accepted the offer of employment, acknowledged the IMPORTANT NOTICE, and signed the Agreement on August 10, 2006 after initialing every page of the Agreement. *See* Agreement.

**C.      The Agreement's Terms**

27.     In the Agreement, Elle acknowledged that it was his intent to be legally bound by the document, that it was necessary because of the access to trade secrets and the confidential proprietary information of the company that he would have as a result of his employment with CentiMark, and that he had received valuable consideration in exchange for the agreement. *See* Agreement, Article III(a)-(c).

28.     In the Agreement, Elle agreed to be bound by certain post–employment obligations, including a non–disclosure of confidential information provision, a non–compete provision, and a non–solicitation of customer provision. *See* Agreement, ¶¶ 4.01, 4.04, 4.05.

-6-

29.     Specifically, Elle agreed that he would not:

[E]ngage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, or otherwise, alone in or in association with any other person, corporation or other entity, in any Competing Business in a Restricted Area for two (2) years from the date of termination (regardless of the reason) of Employee's employment with CENTIMARK ("Restricted Period").

(a)     For the purpose of this Agreement, the term, "Competing Business" shall mean any person, business, enterprise or other entity which sells or attempts to sell any products or services, or other combination thereof, which are the same as, or similar to, the products and/or services sold by CENTIMARK at any time during the last three (3) years that Employee was employed by Centimark.

(b)     For the purpose of this Agreement, a Restricted Area shall mean that area comprised of all of the territory(ies), county(ies), district(s) or other geographical designations in which Employee has operated as an Employee of Centimark at any time during the two (2) year period just prior to Employee's termination.

Agreement, ¶ 4.04.

30.     Elle also promised in the Agreement that:

[D]uring his employment and for the two (2) year period immediately following his employment with CENTIMARK (regardless of the reason for termination), Employee will not, directly or indirectly, solicit the trade of, trade with, contact for business purposes or accept business from any Customer or Prospective Customer of CENTIMARK other than for the benefit of CENTIMARK. For the purpose of this Agreement, the term "Customer" shall mean any person or entity that has procured or agreed to procure CENTIMARK's products or services at any time during Employee's final three (3) years of employment with CENTIMARK and the term "Prospective Customer" shall mean any person or entity that has not yet become a Customer of CENTIMARK but that has been contacted for the sake of doing business or solicited by CENTIMARK during Employee's final two (2) years of employment with CENTIMARK.

The prohibition on solicitation of Customers and Prospective Customers of CENTIMARK, as described in Paragraph 4.05(a), shall be limited to such acts which would constitute Employee's engaging in a Competing Business as described in Paragraph

-7-

4.04(a); however, it shall not prohibit Employee, after termination of employment, from soliciting the trade of such Customers and Prospective Customers while engaged in, or for the promotion and purpose of, a business that is not a Competing Business.

Agreement, ¶ 4.05.

31.     Elle agreed that Pennsylvania law would govern the Agreement without giving effect to the principles of conflicts of law.  He also irrevocably submitted to the personal jurisdiction of the United States District Court for the Western District of Pennsylvania or the Court of Common Pleas of Allegheny County, Pennsylvania, and irrevocably waived any objection to venue for actions brought in those courts.  Agreement, ¶ 7.06.

**D.     Elle Receives the Consideration for Signing the Agreement**

32.     After signing the Agreement, Elle began his employment with CentiMark as an Associate Project Manager and received valuable salary and benefits.

33.     CentiMark subsequently promoted Elle to Senior Project Manager on or about April 1, 2008.

34.     During the time period that Elle served as a Project Manager (whether at the Associate Project Manager or Senior Project Manager levels), he was responsible for managing and overseeing the accounts in his assigned territory.

35.     Elle's territory from 2007 to December of 2008 included almost all of New Mexico, as well as portions of the Phoenix metropolitan area.  In December of 2008, Elle was assigned a new territory, which included the entire state of Arizona and portions of New Mexico. Maps depicting Elle's territories for the years 2007 through 2009 are attached as Exhibit C.

36.     As a Project Manager, Elle's primary responsibility was to sell roofs, roofing systems and repair services in his territory.  He received commission payments based upon a floating scale that was a function of the profitability of the project.

37.     As set forth above, as a Project Manager, Elle had the full support of CentiMark behind him — including inside sales help, administrative support, and full time service and operations employees — that facilitated his ability to establish strong relationships with CentiMark's customers and prospective customers.

38.     Elle was well compensated for his efforts in establishing customer relationships and generating sales on behalf of CentiMark.  He earned almost $75,000 in 2007 and over $126,000 in 2008.

39.     As part of the CentiMark commission program, Elle also received performance–based bonuses.  For example, in September 2008, Elle received a commission check from CentiMark in the amount of $44,522.41.

**E.     Elle Establishes Strong Customer Relationships for CentiMark**

40.     In his nearly three years as a Project Manager, Elle developed new customer relationships and continued to build on customer relationships on CentiMark's behalf.

41.     Many of the customers in his territory became important repeat customers of CentiMark, generating hundreds of thousands of dollars of revenue on an annual basis, which enabled Elle to develop long–standing relationships with these important customers.

42.     For example, Elle established strong customer relationships on behalf of CentiMark with customers such as Reliance Management, Presbyterian Healthcare Services, Foamex Innovations, and ConAgra, Inc.

43.     Reliance Management is a property management and development company located in Phoenix, Arizona.  It has done a number of roofing projects with CentiMark in Elle's territory during the years that he served as a Project Manager; these projects generated revenues for CentiMark in excess of $700,000.

44.    Presbyterian Healthcare Services is a not-for-profit system of hospitals, health-care facilities, and health insurance plan located in Elle's former territory of New Mexico. Elle was responsible for servicing Presbyterian Healthcare Services while employed with CentiMark. Elle generated in excess of $1,250,000 in revenues for CentiMark on numerous roofing contracts for Presbyterian Healthcare Services.

45.    Similarly, Foamex Innovations is a foam manufacturing and supply company with operations worldwide. It hired CentiMark to perform a large roofing project in Elle's territory in Santa Teresa, NM in excess of $600,000.

46.    ConAgra, Inc. is also a client of CentiMark's that maintains facilities in Elle's territory in New Mexico. In 2008, CentiMark was awarded a bid to perform approximately $750,000 worth of roofing projects in Elle's territory on behalf of ConAgra, Inc.

47.    In total, Elle generated in excess of $11,000,000 in revenues in less than three years as a CentiMark Project Manager.

48.    The relationships that Elle has established with long–standing, repeat customers like Reliance Management and Presbyterian Healthcare Services (all with the support and through the expense of CentiMark) are a business interest that is valuable to CentiMark that it has carefully protected through its employment agreement with Elle.

49.    The relationships that CentiMark's salespeople (like Elle) initiate, create, cultivate, nurture and solidify at great expense to CentiMark are a legitimate business interest worthy of protection through post employment restrictions upon its employees.

50.    Such relationships necessarily expose salespeople like Elle to the confidential and proprietary business information of CentiMark and its customers as projects are inspected, specified, quoted, installed, repaired and/or serviced. In addition to developing the customer

relationships themselves, Elle also gained valuable insight into CentiMark's customers' roofing needs, projections and timing of future projects, unique specifications, negotiating strategies, points of contact and decision makers.

51.     In order to perform his functions as a Project Manager, Elle was exposed to CentiMark's confidential and proprietary business information, including product information not publicly available, profit margins, pricing, unique problems or difficulties faced with customers and/or projects that could be exploited by a competitor, customer contact information, sales lists, and sales volumes of customers.

52.     These customer relationships and CentiMark's confidential and proprietary business information — if not entitled to protection — can (and will) be exploited by other roofing contractors offering the same or similar products and services in the same territory. These competitors will gain an unfair competitive advantage over CentiMark by simply acquiring CentiMark's valuable business assets without incurring the costs and expenses necessary to establish such relationships or information themselves through years of trial and effort.

## F.     Elle's Resignation

53.     On June 30, 2009, Elle unexpectedly advised CentiMark that he was resigning his position with the company effective immediately.

54.     CentiMark formally accepted Elle's resignation on June 30, 2009, which was also his last day at CentiMark.

55.     When asked where he intended to work upon leaving CentiMark, Elle responded that he did not know.

G.   **Elle's Employment with Highland**

56.   After he resigned, CentiMark became aware that Elle had accepted a position with Highland.

57.   Highland is a roofing company headquartered in Gilbert, Arizona, approximately 30 miles from CentiMark's Arizona office located at 1956 West Cheryl Drive, Phoenix, Arizona 85021.

58.   Highland's office is within the territory in which Elle worked for CentiMark, and therefore within the Restricted Area as defined by the Agreement.

59.   Highland is a competitor of CentiMark's in the Phoenix metropolitan area for the provision of roofing services.

60.   Shortly after learning that Highland had hired Elle, CentiMark also learned that Elle had solicited at least one CentiMark customer that he formerly called upon while he was employed by CentiMark.

61.   CentiMark notified Elle of this violation of his non–competition obligations under the Agreement by way of an overnight letter sent July 24, 2009.  A true and correct copy of this letter and the UPS Shipment Receipt is attached as Exhibit D.

62.   CentiMark also advised Highland via overnight letter dated July 24, 2009 that Elle was bound by the non–competition obligations contained in the Agreement.  A true and correct copy of this letter is attached as Exhibit E.

63.   Elle's illegal solicitation of CentiMark's customers on behalf of Highland is occurring in the very territory he previously serviced for CentiMark.

64.   Upon information and belief, Elle continues to violate the terms of his Agreement with CentiMark by, *inter alia*, violating the terms of his non–competition provision, soliciting

CentiMark customers and prospective customers, misappropriating CentiMark's confidential and proprietary information and trade secrets, and unfairly competing with CentiMark on behalf of Highland in the very territory he used to service for CentiMark.

65.     Despite being apprised of Elle's obligations under the terms of his Agreement, Highland has continued to employ Elle to unfairly compete with CentiMark.

66.     Upon information and belief, Highland has misappropriated CentiMark's confidential and proprietary information and trade secrets to unfairly compete with CentiMark.

**H.      CentiMark is Entitled to Preliminary and Injunctive Relief**

67.     CentiMark is likely to succeed on the merits of this case because it has a valid, enforceable agreement with Elle, it has legitimate business interests to protect, and Elle's breach of the Agreement is open, blatant and obvious.

68.     Similarly, CentiMark is likely to succeed on the merits with respect to Highland because Highland's tortious interference with CentiMark's enforceable agreement with Elle and its unfair competition with CentiMark is open, blatant, and obvious.

69.     CentiMark's customer relationships, goodwill, market share, business opportunities, competitive advantage, confidential information and relations with its remaining employees will be irreparably harmed if a preliminary and permanent injunction is not entered.

70.     CentiMark will suffer far greater harm if a preliminary and permanent injunction is not granted than Elle and Highland will suffer if one is granted.  Elle and Highland will suffer no harm — Elle will simply be ordered to honor the promises he made.

71.     Granting a preliminary injunction would serve the public interest.

## COUNT I
## Breach of Contract
### (CentiMark v. Elle)

72.     CentiMark incorporates by reference Paragraphs 1 through 71 of the Complaint as if the same were set forth in full herein.

73.     The Agreement is a valid, enforceable contract supported by adequate consideration that Elle voluntarily and knowingly accepted.

74.     Elle has breached (and continues to breach) the Agreement by accepting employment with Highland, soliciting CentiMark's customers on behalf of Highland, and disclosing and/or using CentiMark's confidential and proprietary business information on behalf of Highland.

75.     The post–employment restrictions contained in Elle's Agreement are reasonably limited to protect CentiMark's legitimate business interests.

76.     Elle's knowing, willful, intentional, and unprivileged breach of the Agreement has caused — and will continue to cause — immediate and irreparable harm to CentiMark, as well as causing it to suffer other compensatory damages.

## COUNT II
## Violation of the Pennsylvania Uniform Trade Secrets Act
### (CentiMark v. All Defendants)

77.     CentiMark incorporates by reference Paragraphs 1 through 76 of the Complaint as if the same were set forth in full herein.

78.     Elle and Highland are "persons" as defined by the Pennsylvania Uniform Trade Secrets Act ("PUTSA") codified at 12 Pa. Cons. Stat. Ann. § 5301 *et seq*.

79.     CentiMark possesses valuable trade secrets, and confidential and proprietary business information relating to the roofing business, its operations, its customers, its employees,

-14-

its financial data and its products, which derives its value (in part) from not being generally known or readily ascertainable through independent development.

80.     CentiMark has spent significant time and money developing its trade secrets and confidential and proprietary business information.  It has also taken steps to protect this information from disclosure, including requiring employees who have access to this type of information to execute employment agreements with confidentiality restrictions.

81.     Disclosure of this type of information to CentiMark's competitors, like Highland, would undermine CentiMark's competitive position in the marketplace.

82.     Elle had access to CentiMark's trade secrets, and its confidential and proprietary business information, following his hiring in August 2006.

83.     Since leaving CentiMark, upon information and belief, Elle has misappropriated, misused and disclosed such information on behalf of Highland, a competitor of CentiMark's

84.     Defendant's conduct is willful, intentional, malicious, unprivileged, and in bad faith and has caused (and will continue to cause) irreparable harm to CentiMark, as well as causing it to suffer other compensatory damages.

85.     Pursuant to Sections 5303–5305 of the PUTSA, CentiMark is entitled to injunctive relief, double damages, affirmative relief to ensure the protection of its trade secrets, reasonable attorney's fees, exemplary damages, and/or other appropriate relief.

**COUNT III**
**Tortious Interference with Contract and with Existing**
**and Prospective Business Relations**
**(CentiMark v. All Defendants)**

86.     CentiMark incorporates by reference Paragraphs 1 through 85 of the Complaint as if the same were set forth in full herein.

87.     CentiMark currently has existing contractual relations with customers that are covered under the non–solicitation/non–competition provisions of the Agreement.

88.     Because of the nature of the industry and the strong customer relationships that have been developed over time, CentiMark has a prospective contractual relationship with a number of customers and prospective customers that are covered by the non–competition/non–solicitation provisions of the Agreement.

89.     Elle and Highland have no privilege or justification to interfere with the contractual or prospective contractual relationships that CentiMark has developed with its customers or prospective customers.

90.     Elle, on behalf of and with the approval of Highland, has acted intentionally to interfere with the contractual and/or prospective contractual relationships that CentiMark has with its customers and prospective customers.

91.     Elle's actions have caused and will continue to cause irreparable harm to CentiMark by damaging its contractual and prospective contractual relationships with its customers, harming its goodwill, disclosing its trade secret and confidential and proprietary business information, as well as causing it to suffer other compensatory damages.

## COUNT IV
### <u>Tortious Interference With Contractual Relations</u>
### (CentiMark v. Highland)

92.     CentiMark incorporates by reference Paragraphs 1 through 91 of the Complaint as if the same were set forth in full herein.

93.     By engaging in the conduct described above, and with the knowledge of Elle's Agreement with CentiMark, Highland has tortiously interfered with the Agreement.

94.     Highland's conduct is willful, intentional, and unprivileged, and has caused (and is causing) irreparable harm to CentiMark, as well as causing it other compensatory damages.

## COUNT V
### Unfair Competition
### (CentiMark v. All Defendants)

95.     CentiMark incorporates by reference Paragraphs 1 through 94 of the Complaint as if the same were set forth in full herein.

96.     Defendants, by engaging in the conduct described above, have engaged in unfair competition with CentiMark.  Their conduct has caused (and will continue to cause) damage to CentiMark's goodwill, customer relationships, prospective customer relationships, contractual relationships and valuable business interests.

97.     Defendants' conduct has been (and continues to be) willful, intentional and unprivileged and has caused (and will continue to cause) CentiMark to suffer immediate, irreparable harm, as well as other compensatory damages.

98.     Defendants' conduct, as described above, is contrary to honest industrial and commercial practices.

## COUNT VI
### Breach of Fiduciary Duty/Duty of Loyalty
### (CentiMark v. Elle)

99.     CentiMark incorporates by reference Paragraphs 1 through 98 of the Complaint as if the same were set forth in full herein.

100.     Elle occupied a position of trust and confidence while employed by CentiMark.

101.     As such, Elle owed CentiMark fiduciary duties and a duty of loyalty.

102.     Those duties existed while Elle was employed by CentiMark and continued after his voluntary resignation.

103.     Elle's conduct, as described above, constitutes a breach and continuing breach of his fiduciary duties and duty of loyalty.

104.     Elle's conduct has been (and continues to be) willful, intentional and unprivileged and has caused (and will continue to cause) CentiMark to suffer immediate, irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, CentiMark respectfully requests this court enter an order:

1.     Enjoining Elle, preliminarily and then permanently for a period of two years from the date of the order, pursuant to the tolling provisions of Paragraph 7.02 of the Agreement, from:

      (a) misappropriating or disclosing or making available to any person or any entity the confidential information, trade secrets and proprietary information of CentiMark as defined by the Agreement and the Pennsylvania Uniform Trade Secret Act, including (but not limited to) customer names and information, profit margins, bidding information, pricing information, and unique business and negotiation strategies;

      (b) possessing any confidential information, trade secrets or proprietary information of CentiMark's as defined by the Agreement and the Pennsylvania Uniform Trade Secret Act, including (but not limited to) customer names and information, profit margins, bidding information, pricing information, and unique business and negotiation strategies and ordering any such materials be immediately returned to CentiMark pursuant to Paragraph 4.01 of the Agreement;

      (c) remaining in the employ of Highland pursuant to Paragraphs 4.04 of the Agreement;

      (d) soliciting the customers or Prospective Customers of CentiMark pursuant to Paragraph 4.05 of the Agreement;

      (e) illegally competing with CentiMark in violation of Paragraph 4.04 and 4.05 of the Agreement.  CentiMark also respectfully requests this court grant CentiMark compensatory damages including its reimbursement of attorneys' fees pursuant to Paragraph 5.03 of the Agreement and any other relief this court deems appropriate.

-18-

2.      Enjoining Highland, preliminarily and then permanently for a period of two years from the date of the order from:

> (a) encouraging, soliciting, authorizing, or allowing Elle from competing, or attempting to compete with CentiMark in the provision of roofing services and products;
>
> (b) encouraging, soliciting, authorizing, or allowing Elle to disclose CentiMark's confidential information and trade secrets as defined by the Agreement and the Pennsylvania Uniform Trade Secret Act to anyone in order to compete, indirectly compete, or attempt to compete with CentiMark in the provision of roofing services and products;
>
> (c) using or disclosing any of CentiMark's confidential information and trade secrets as defined by the Agreement and the Pennsylvania Uniform Trade Secret Act including (but not limited to) customer names and information, profit margins, bidding information, pricing information, and unique business and negotiation strategies.

3.      Requiring Elle and Highland to file an accounting of all of Elle's sales (and the receipts, gross profits, and expenses relating thereto) made on behalf of Highland.

4.      Awarding CentiMark compensatory damages, including pre– and post–judgment interest.

5.      Awarding CentiMark punitive damages and/or double damages pursuant to 12 Pa. Cons. Stat. Ann. § 5304 for Elle and Highland's willful, intentional and malicious conduct.

6.      Awarding CentiMark all costs and expenses in connection with this action, including its reasonable attorney's fees pursuant to the terms of the Agreement and/or pursuant to 12 Pa. Cons. Stat. Ann. § 5305.

7.      Awarding any other relief as the Court may deem to be just or appropriate.

8.      CentiMark hereby demands a trial by jury.

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

By: /s/ Gregory J. Krock
    Gregory J. Krock
    Pa. I.D. No. 78308
    Corrado Salvatore
    Pa. I.D. No. 203639

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219–1410
(412) 562–3983/1825

Attorneys for Plaintiff, **CentiMark Corporation**

## VERIFICATION

I, Barbara Felton, am the Vice President Human Resources of CentiMark Corporation and am authorized to execute this Verification on its behalf. I verify that I have read the foregoing **Verified Complaint,** and that the averments contained therein are true and correct to the best of my knowledge, information, and belief.

This statement is made subject to the penalties relating to unsworn falsification to authorities.


Dated:  September  //, 2009                    *Barbara Felton*